UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| VELMA GROSS, EUGENE GROSS, and SIERRA GROSS, b/n/f VELMA GROSS | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 3:11-cv-463 PPS |
| RICHARD L. MAX, SR., and DELORES C. MAX, | ) ) ) | |
| Defendants. | ) | |

**OPINION and ORDER**

Velma and Eugene Gross purchased a home from Richard and Delores Max in 2006 and have lived their since then. In 2008 the Grosses had a daughter, Sierra, and a year later they discovered she had lead poisoning. On November 9, 2011, the Grosses filed this suit seeking recovery from the Maxes under the Residential Lead-Based Paint Hazard Reduction Act (referred to herein either as "RLPHRA" or "the Act"). The Maxes have moved to dismiss claiming that, among other things, the action is barred by the statute of limitations. [DE 6 and DE 8.] For the reasons detailed below, the motions to dismiss will be granted.

**Background**

The Grosses allege that the Maxes violated RLPHRA, which was passed by Congress to curb the harm caused to children by lead paint poisoning. *See* 42 U.S.C. § 4851 et seq. RLPHRA includes certain disclosure requirements for the sale or lease of certain residences constructed prior to 1978. *Id.* at § 4851b(27). Specifically, the seller or lessor must provide a buyer or lessee a lead hazard information pamphlet, disclose the presence of any known lead-based paint or any known lead-based paint hazards in the residence, and permit the buyer or

lessee a 10-day period of time to inspect the residence. *Id.* at § 4852d. This section of the statute also requires the owner or lessor to include a "Lead Warning Statement" in the purchase agreement, and the buyer or lessor is required to sign a statement acknowledging that they read the statement, received the pamphlet, and had the 10-day inspection opportunity. *Id.* The Act provides civil liability under 42 U.S.C. § 4852d(b)(3), such that "[a]ny person who knowingly violates the provisions of this section shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount of damages incurred by such individual."

With this sketch of the statutory scheme as a backdrop, here is what is alleged to have happened in this case: On November 10, 2006, Velma and Eugene Gross entered into a Lease with Option to Purchase a property at 1514 W. Franklin St., Elkhart, Indiana with Richard L. Max, Sr. The Grosses moved into the residence on November 10, 2006. Because they signed an Agreement to Purchase the Residence, the Grosses became its equitable owners. Despite the fact that the residence was constructed prior to 1978, the Maxes did not provide the Grosses with a lead paint hazard information pamphlet, disclose the presence of any known lead-based paint or lead-based paint hazards, or permit the Grosses a 10-day inspection periods as required by 42 U.S.C. § 4852d.

The Grosses moved into the house and their child Sierra was born on February 6, 2008. She's resided at the residence ever since. In late June of 2009, medical testing on Sierra revealed elevated levels of lead in her bloodstream. Then, on July 8, 2009, the Elkhart County Health Department assessed the residence and a month later sent the Maxes a letter stating that the residence "does contain lead at levels that may pose a hazard to children living at [the Residence]." [DE 1-2.] Another test of Sierra's blood on September 11, 2009 further confirmed

she had elevated levels of lead.

On November 9, 2011, the Grosses filed their Complaint against the Maxes. The Complaint names Velma, Eugene, and Sierra Gross as plaintiffs, and seeks recovery from the Maxes for damage to the residence and personal injuries under the Act. The Maxes have now filed two motions to dismiss – one for Velma and Eugene and another for Sierra – arguing that, among other things, this action is barred by the statute of limitations.

**Discussion**

The minimum requirements for pleading a claim for relief are contained in Federal Rule of Civil Procedure 8. That rule requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. But to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007). And although at this stage I must accept all allegations as true and draw all reasonable inferences in the complainant's favor, I don't need to accept threadbare legal conclusions supported by mere conclusory statements. *Iqbal*, 129 S.Ct. at 1949-50.

The Grosses seek recovery under RLPHRA for damages to the residence and for personal injuries. The threshold issue raised in Defendants' motions to dismiss is whether the action is time-barred by the statute of limitations. And while the statute of limitations is usually an affirmative defense, plaintiffs can plead themselves out of court if they allege facts that demonstrate that a claim is time-barred. *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 675 (7th Cir. 2009) (dismissal appropriate where it is "clear from the face of the

amended complaint that it is hopelessly time-barred"); *U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003) ("A litigant may plead itself out of court by alleging (and thus admitting) the ingredients of a defense."). I ultimately conclude that that is what has occurred here, but arriving at that conclusion requires a somewhat lengthy tour through the Act's statutory framework.

Congress was explicit about the purposes of the Act when it was enacted and it is worth stating them in full here:

> (1) develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible;
>
> (2) reorient the national approach to the presence of lead-based paint in housing to implement, on a priority basis, a broad program to evaluate and reduce lead-based paint hazards in the nation's housing stock;
>
> (3) encourage effective action to prevent childhood lead poisoning by establishing a workable framework for lead-based paint hazard elimination and reduction, and by ending confusion over reasonable standards of care;
>
> (4) ensure that the existence of lead-based paint hazards is taken into account in the development of government housing policies and in the sale, rental, and renovation of homes and apartments;
>
> (5) mobilize national resources expeditiously, though a partnership among all levels of government and the private sector, develop the most promising, cost-effective methods for evaluating and reducing lead-based paint hazards;
>
> (6) reduce the threat of childhood lead poisoning in housing owned, assisted, or transferred by the federal government; and
>
> (7) educate the public concerning the hazards and sources of lead-based paint poisoning and steps to reduce and eliminate such hazards.

42 U.S.C.A. § 4851a.

The impetus for the law was, moreover, explicitly focused on the problem of lead-poisoning for children:

> The Congress finds that –
>
> (1) low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children under age 6, with minority and low-income communities disproportionately affected;
>
> (2) at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems; . . .
>
> (4) the ingestion of household dust containing lead from deteriorating or abraded lead-based paint is the most common cause of lead poisoning in children.

42 U.S.C. §§ 4851(1)-(2), (4).

There is thus no serious question that the overriding purpose of the Act is to protect children from lead poisoning. In achieving this purpose, Congress was mostly focused on requiring that federal agencies take various actions to ameliorate that harm. Thus, for instance, the Secretary of Housing and Urban Development is authorized to provide grants to eligible applicants to evaluate and reduce lead-based paint hazards. 42 U.S.C. § 4852(a)-(d). The Act also provides for the establishment of a task force by the HUD Secretary, in consultation with the Administrator of the Environmental Protection Agency, to make recommendations on expanding resources and efforts to evaluate and reduce lead-based paint hazards in private housing. 42 U.S.C. § 4852a. The HUD Secretary is required to consult on an ongoing basis with this task force as well as with the Administrator of the EPA, the Director of the Centers for Disease Control, and other federal agencies concerned with lead poisoning prevention. 42 U.S.C. § 4852b. It also requires the HUD Secretary, in consultation with the Administrator of the EPA, the Secretary of Labor, and the Secretary of Health and Human Services (acting through the Director of the Centers for Disease Control), to issue guidelines for the conduct of federally supported work involving risk assessments, inspections, interim controls, and

abatement of lead-based paint hazards. 42 U.S.C. § 4852c. The Act further requires the HUD Secretary, in cooperation with other federal agencies, to conduct research on strategies to reduce the risk of lead exposure from other sources, including exterior soil and interior lead dust in carpets, furniture, and forced-air ducts. 42 U.S.C.A. § 4854.

The vast majority of the Act thus directs action by certain federal officials to help attack the problem of lead paint exposure. But in addition to these regulatory requirements, one aforementioned section of the Act places specific burdens on private sellers to provide various disclosures to buyers and provides for a private civil action if the disclosures are not provided. 42 U.S.C.A. § 4852d. This is the only section of the Act that provides for private civil liability,[1] and any person who knowingly violates the disclosure provisions is jointly and severally liable to the buyer in an amount equal to three times the amount of damages incurred. 42 U.S.C.A. § 4852d(b)(3).

A few things are clear from all of this. Congress was very concerned with the harm caused by lead, particularly to children. In trying to ameliorate that harm, it focused mostly on the work of administrative agencies. It also placed stringent disclosure requirements on sellers and lessors to try to make sure that buyers and lessees would not unsuspectingly find themselves living with lead paint. If sellers and lessors failed to provide the proper disclosures, they would be liable for civil damages.

With all this, however, it is also clear that the Act does not provide for a cause of action

---

[1]While some plaintiffs have attempted to enforce the Act through 42 U.S.C. § 1983, courts have held that the Act does not create rights enforceable under Section 1983. *See Santiago ex rel. Muniz v. Hernandez*, 53 F. Supp. 2d 264 (E.D.N.Y. 1999); *Mair v. City of Albany, New York*, 303 F. Supp. 2d 237 (N.D.N.Y. 2004).

against sellers and lessors if a buyer or lessee subsequently gets lead paint poisoning. That is, while lead paint poisoning is *obviously* the true "harm" that the Act is trying to remedy, the only injury for which that the statute provides a civil remedy is the "harm" of not receiving the proper disclosures in the first place. The statute is thus silent about providing a remedy for the harm of later being poisoned with lead paint. This is not to say that an individual is left entirely without a remedy for lead-point poisoning – there very well be state law causes of action available. *See*, *e.g.*, *Erwin v. Roe*, 928 N.E.2d 609, 620-22 (Ind. Ct. App. 2010) (discussing lead paint poisoning claims in the context of a landlord's failure to deliver the property in a safe, clean and habitable condition, failure to comply with health and housing codes, and failure to remedy the condition on the property after notice had been provided). But it is to say that the Act provides no such remedy.

All of this is simply prologue to the threshold issue in this case: the statute of limitations for claims under the Act and when such claims accrue. Because there is no statute of limitations contained within the Act itself, the parties agree that the four-year, catch-all federal statute of limitations 28 U.S.C. § 1658 applies to this action. *See* DE 11 at 4-6 and DE 13 at 1-2; *see also Lacey v. Village Green Apartments*, 2007 WL 2750664 (W.D. Mo. 2007) (the applicable statute of limitations for claims alleging violations of the Act is four years after the cause of action accrues under 28 U.S.C. § 1658). Here's what that catch-all statute of limitations says:

> (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.
>
> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c (a)(47)), may be brought not later

than the earlier of—

    (1) 2 years after the discovery of the facts constituting the violation; or

    (2) 5 years after such violation.

28 U.S.C. § 1658.

The next issue is when that four-year clock started ticking – *i.e.*, when did the Grosses' claim accrue. "The starting point for determining when a claim accrues is the alleged unlawful conduct. In other words, we first ask what alleged unlawful conduct forms the basis for the claim and when this act occurred." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1139 (7th Cir. 1992). In this case, that unlawful conduct is the failure to provide the required disclosures prior to the Grosses taking ownership of the house, which occurred on November 10, 2006. This "is not, however, the end of the accrual analysis under federal common law. Rather, under the federal discovery rule, a claim accrues once the party performs the alleged unlawful act and once the party bringing a claim discovers an injury resulting from this unlawful act." *Id.*

The parties dispute whether the "discovery rule" applies to a RLPHRA cause of action and to the limitations period stated in Section 1658. This dispute is complicated because the law on the "discovery rule" is fairly convoluted. *See*, *e.g.*, *William A. Graham Co. v. Haughey*, 646 F.3d 138, 146–151 (3d Cir. 2011) (exhaustively discussing the "quite common ... misapprehension of the nature of the discovery rule" and whether it changes the date of accrual or tolls the running of the limitations period). I need not wade into this legal morass, however, because in this case the Grosses' claims are time-barred no matter whether the discovery rule applies or not.

First, if the discovery rule does not apply, then it is clear that the four-year statute of

limitations clock began running when the Grosses failed to receive the required disclosures prior to taking ownership of the house, which occurred on November 10, 2006. On that analysis, this case, filed on November 9, 2011, is one-year too late.

Even if the discovery rule does apply, however, I find that the four-year clock also began running when Plaintiffs became owners of the property on November 10, 2006. The discovery rule depends on when plaintiffs discover – or *should have discovered* via due diligence – their injuries. As the Supreme Court recently explained:

> Thus, treatise writers now describe "the discovery rule" as allowing a claim "to accrue when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." 2 Corman § 11.1.1, at 134 (emphasis added); see also *ibid.*, n. 1 (collecting cases); 37 Am. Jur. 2d, Fraud and Deceit § 347, p. 354 (2001 and Supp. 2009) (noting that the various formulations of "discovery" all provide that "in addition to actual knowledge of the fraud, once a reasonably diligent party is in a position that they should have sufficient knowledge or information to have actually discovered the fraud, they are charged with discovery"); *id.*, at 354–355, and nn. 2–11 (collecting cases).

*Merck & Co., Inc. v. Reynolds*, __ U.S. __, 130 S.Ct. 1784, 1794 (2010). *See also Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 441 (7th Cir. 2005) ("the discovery rule tolls the statute of limitations until such time as the plaintiff knew *or reasonably should have known* that she has a cause of action for her injury") (emphasis added); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Com'n*, 377 F.3d 682, 688 (7th Cir. 2004) (under the discovery rule "a cause of action accrues when the plaintiff knew *or should have known* that it had sustained an injury") (emphasis added); *Ferguson v. Roberts*, 11 F.3d 696, 705 (7th Cir. 1993) ("the federal accrual rule is a discovery rule; the statute does not run unless the plaintiff knew *or should have known* about his injury") (emphasis added).

In this case, the question of when the Grosses discovered or *should have* discovered their

9

injuries is complicated by two factors. First is the Grosses argument that they only could have "discovered" their injury in 2009 when Sierra's medical tests showed elevated levels of lead in her blood. This argument only makes sense, however, if RLPHRA provided a cause of action for lead poisoning. As we have seen, it doesn't – it only provides a cause of action for the failure to be given the proper disclosures. *See Mason ex rel. Heiser v. Morrisette*, 403 F.3d 28, 31 (1st Cir. 2005) ("a violation of [RLPHRA] occurs when the seller or lessor fails to disclose").

That brings us to the second complicating factor: how do we evaluate when a plaintiff discovered, or *should have* discovered, a failure to provide disclosures? The problem with this analysis is that the vast majority of buyers or lessees would only discover that the disclosures were required in the first place once they were actually disclosed to them, at which point there would be no injury.

Nevertheless, in this context at least, the only really manageable way to apply the discovery rule is to hold that, "at a minimum, [plaintiffs] should have discovered" that a defendant did not provide the required disclosures at the time the disclosures were required. *Randall v. Laconia, NH*, 679 F.3d 1, __ (1st Cir. 2012). That conclusion, reached by the First Circuit just two months ago in *Randall*, is directly applicable to this case. The plaintiff in *Randall* purchased a house from the defendant in July of 2003 and was not provided with the proper RLPHRA disclosures. In 2008, the plaintiff's two-year-old son's blood tests revealed elevated levels of lead. Two years later, on February 9, 2010, he filed suit alleging that the defendant violated RLPHRA's disclosure requirements. The district court dismissed the case as time-barred, and the First Circuit affirmed.

The First Circuit first reconfirmed that "[a] violation of the Act occurs when the seller

10

fails to make the necessary disclosures." *Randall*, 679 F.3d at __. The court then explained that the plaintiff's cause of action accrued when the disclosures were not made:

> [T]he City was required to comply with the Act's requirements—provide the information pamphlet, allow the inspection period, disclose the existence of lead-based paint hazards, relinquish any evaluation reports—prior to July 22, 2003, the date on which closing occurred. Consequently, as of that date the City was one-hundred percent non-compliant and Randall had a complete and present cause of action. When he signed the closing documents, without the City's having complied with the Act, he was injured. Randall could have filed suit, and potentially obtained relief, at that time. Our conclusion: Randall's cause of action against the City accrued on July 22, 2003 unless he is saved by the application of a discovery rule.

*Id.* at __. The court went on to conclude that, even if the discovery rule did apply, the cause of action still accrued at the time the disclosures were supposed to have been made:

> Because at the time of closing Randall had discovered (or at a minimum should have discovered) that the City had not completed the disclosure form or made any of the compulsory disclosures, the statute of limitations clock started ticking. It is not necessary that Randall knew the full extent of, or the particulars of, the City's wrongful conduct. . . . Even applying the discovery rule, Randall's cause of action still accrued when he closed on the property on July 22, 2003.

Id. at __. This conclusion makes intuitive sense as a policy matter, since otherwise plaintiffs could argue that they only "discovered" their injury when they actually became cognizant of the disclosure law itself. That would be an unworkable standard because it could toll the limitations period for decades, it would depend entirely on plaintiffs' own statements about their knowledge of the law, and it would provide the perverse incentive for potential plaintiffs to remain ignorant of the law.

I thus conclude – given RLPHRA's plain language that it is remedying the injury of non-disclosure, the recent holding in *Randall*, and the fact that the discovery rule is limited by a due diligence standard – that Plaintiffs' RLPHRA claims are time-barred, no matter whether the

11

discovery rule applies or not. Plaintiffs became owners of the property on November 10, 2006. At that point, as in *Randall*, "at a minimum [they] should have discovered" that defendants had not provided the required disclosures. Their four-year statute of limitations clock thus started ticking at that point and they had until November 10, 2010 to file their lawsuit. They filed their suit on November 9, 2011, one-year too late.

**Conclusion**

For the reasons stated above, Defendants' Motions to Dismiss [DE 6 and DE 8] are **GRANTED,** and this case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

ENTERED: August 2, 2012

   s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT